[No. H013273. Sixth Dist. Oct. 25, 1995.]

ALYSON C. CONIGLIO, Plaintiff and Respondent, v.
DEPARTMENT OF MOTOR VEHICLES, Defendant and Appellant.

COUNSEL

Daniel E. Lungren, Attorney General, Robert R. Buell and Gregory J. Rolen, Deputy Attorneys General, for Defendant and Appellant.

Hudson, Martin, Ferrante & Street and Peter J. Coniglio for Plaintiff and Respondent.

OPINION

**ELIA, J.**—The trial court granted a writ of mandate directing the Department of Motor Vehicles (DMV) to reinstate respondent Alyson C. Coniglio's

driving privileges following her violation of Vehicle Code section 23136 et seq., the zero tolerance law.[1] The trial court decided that the preliminary alcohol screening (PAS) device used to test respondent did not meet the breath-alcohol analysis standards set forth in title 17 of the California Code of Regulations.[2] The trial court also found that the DMV did not prove the PAS device was otherwise reliable.

We conclude that the breath-alcohol analysis standards under title 17 of the California Code of Regulations do not apply to preliminary alcohol screening devices. We also conclude that it was the DMV's burden to show that the PAS device was reliable. However, we agree with the trial court's conclusion that the DMV did not establish that reliability. Accordingly, we will affirm the judgment.

### Facts and Procedural Background

On March 11, 1994, at approximately 12:45 a.m., Officer Short of the Monterey Police Department observed respondent stopped at a red light. After noticing that respondent was not wearing a seat belt, Officer Short made a traffic stop. Officer Short asked for respondent's driver's license. Respondent admitted that she didn't have her license with her. She verbally identified herself. Officer Short noted that respondent was under 21 years of age.[3]

Officer Short detected the odor of an alcoholic beverage coming from the car. He also noticed that respondent's eyes were bloodshot. Respondent admitted that she had been drinking alcohol.

Officer Short conducted field sobriety tests and determined that respondent was not under the influence. He advised her of the "zero tolerance" law. She agreed to take a PAS test. The first sample, given at 12:55 a.m., showed respondent's blood-alcohol level to be .056. The second sample, given at 12:56 a.m., showed her blood-alcohol level to be .055. Officer Short issued a temporary license endorsement which notified respondent that her driving privilege would be suspended in 30 days.

Respondent requested an administrative hearing with the DMV. The hearing was held on April 14, 1994. At the hearing, respondent admitted that she had been drinking beer on the night she was stopped. Officer Short

[1]Unless otherwise noted, all statutory references are to the Vehicle Code.
[2]California Code of Regulations, title 17, sections 1215-1222.2.
[3]Respondent's date of birth is March 1, 1974.

testified about the PAS device used to test respondent but did not identify the brand or model of the device used. Officer Short testified that the device was issued to him in November or December of 1993. He said the device was brand new at that time. He received approximately two hours of training covering the operating procedures and the manual of the PAS device. Officer Short testified that the device has an internal calibration mechanism that advises the user if the device is not operable. The device requires calibration service about once a year. Officer Short testified that the manufacturer's representative found his particular device to be in calibration at the police chief's conference held in February of 1994. Officer Short stated that the PAS results are extremely close and consistent with the legal blood, urine or breath test results that are obtained in driving-under-the-influence arrests.

The DMV upheld the suspension. Respondent petitioned for a writ of mandate. The trial court granted the petition, finding that the PAS test did not comply with title 17 of the California Code of Regulations and that the DMV failed to show the reliability of the test. The DMV filed a timely appeal.[4]

## Standard of Review

■ "Upon the driver's timely request, the Department must hold an administrative hearing at which the evidence is not limited to that presented at the prior administrative review. [Citation.] The Department's determination is then subject to judicial review. [Citation.] The trial court must conduct its review on the record of the hearing and may not consider other evidence. [Citation.] The task for the trial court is to determine, exercising its independent judgment, whether the administrative decision was supported by the weight of the evidence. [Citations.]" (*Santos* v. *Department of Motor Vehicles* (1992) 5 Cal.App.4th 537, 545 [7 Cal.Rptr.2d 10].) On appeal, we consider "whether the evidence reveals substantial support, contradicted or uncontradicted, for the trial court's conclusion that the weight of the evidence does not" support the DMV's order suspending respondent's license. (*Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 72-73 [64 Cal.Rptr. 785, 435 P.2d 553]; *Bell* v. *Department of Motor Vehicles* (1992) 11 Cal.App.4th 304, 309 [13 Cal.Rptr.2d 830].) In reaching our decision, we will make all legitimate and reasonable inferences in favor of the trial court's conclusion. (*Yakov* v. *Board of Medical Examiners, supra*, 68 Cal.2d at p. 72; *Bell* v. *Department of Motor Vehicles, supra*, 11 Cal.App.4th at p. 309.)

---

[4]DMV asks that we take judicial notice of certain documents lodged with the DMV's appeal. We will grant the request for judicial notice.

## Discussion

The trial court decided that a PAS device used to enforce the zero tolerance law must comply with title 17 of the California Code of Regulations. For reasons we shall explain, we conclude that title 17 does not apply.

### A. Zero Tolerance Law

We begin by reviewing the relevant statutory scheme. The zero tolerance law makes driving a vehicle unlawful for a person under the age of 21 years with a blood-alcohol concentration of 0.01 percent or greater. (§ 23136, subd. (a).)[5] Under the zero tolerance law, the 0.01 percent blood-alcohol concentration is "measured by a preliminary alcohol screening [PAS] test." (§ 23136, subd. (a).) Specifically, section 23136 provides, "(a) Notwithstanding Sections 23152 and 23153, it is unlawful for a person under the age of 21 years who has a blood-alcohol concentration of 0.01 or greater, as measured by a preliminary alcohol screening test, to drive a vehicle. . . . [¶] (b) A person shall be found to be in violation of subdivision (a) if the person was, at the time of driving, under the age of 21 years, and the trier of fact finds that the person had consumed an alcoholic beverage and was driving a vehicle with a blood-alcohol concentration of 0.01 percent or greater, as measured by a preliminary alcohol screening test."

Under section 23136, subdivision (c)(1), "Any person under the age of 21 years who drives a motor vehicle is deemed to have given his or her consent to a preliminary alcohol screening test for the purpose of determining the presence of alcohol in the person . . . ." "For the purposes of this section, a preliminary alcohol screening test device is an instrument designed and used to measure the presence of alcohol in a person based on a breath sample." (§ 23137, subd. (c).)

Violating the zero tolerance law is neither an infraction nor a public offense, as defined under Penal Code section 15. A zero tolerance law violation is subject only to civil penalties, to be administered by the DMV through specified civil administrative procedures. (§ 23138.) Once a licensee is cited for violating the zero tolerance law, the DMV must then review the officer's sworn report and make a determination of the facts requiring suspension. This ruling is final unless the licensee timely requests a hearing pursuant to section 13558. (§ 13557.) Upon the licensee's timely request, the

---

[5]If the person refuses to take, or fails to complete, the PAS test or if the person takes the PAS test and that test reveals a blood-alcohol concentration of 0.01 percent or greater, the officer is required to suspend the person's driving privilege and to issue a 30-day temporary driver's license. (§ 23137, subd. (b).)

DMV must hold an administrative hearing at which the evidence is not limited to that presented at the prior administrative review. (§ 13558, subd. (b).) Within 30 days of the issuance of the final notice of the DMV's determination sustaining the order of suspension of the licensee's driving privilege, the licensee may petition for judicial review. The court may only consider the evidence presented in the section 13558 hearing. (§ 13559.)

B. *Interpretation of Zero Tolerance Law*

To decide whether the trial court was correct in this case, we must interpret the zero tolerance law. ■ "In interpreting the language of a statute, we first turn to the words themselves." (*Gikas* v. *Zolin* (1993) 6 Cal.4th 841, 854 [25 Cal.Rptr.2d 500, 863 P.2d 745].) In construing a statute, "[A] court should ascertain the intent of the Legislature so as to effectuate the law's purpose, and in determining intent the court first turns to the words used. [Citation.]" (*People* v. *Overstreet* (1986) 42 Cal.3d 891, 895 [231 Cal.Rptr. 213, 726 P.2d 1288].) If "statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it. [Citations.]" (*Ibid.*)

■ In this case, section 23136's plain language demonstrates that the PAS test is the device the Legislature has chosen to enforce the zero tolerance law. Section 23136, subdivision (a) specifically states that the 0.01 blood-alcohol concentration is to be "measured by a preliminary alcohol screening [PAS] test." (§ 23136, subd. (a).) Section 23136, subdivision (b) provides that the trier of fact must consider whether the licensee was driving a vehicle with a blood-alcohol concentration of 0.01 percent "as measured by a preliminary alcohol screening test."

Further, section 23137's plain language shows that the PAS test is to be used to measure the *presence* of alcohol, rather than the particular blood-alcohol concentration. Under section 23137, subdivision (c), "a preliminary alcohol screening test device *is an instrument designed and used to measure the presence* of alcohol in a person based on a breath sample." (§ 23137, subd. (c), italics added.) Similarly, section 23136, subdivision (c)(1) provides that a person under age 21 who drives a motor vehicle is deemed to have consented to a PAS test "for the purpose of determining the *presence* of alcohol in the person . . . ." (Italics added.)

The legislative history of the zero tolerance law validates the plain language of the statutory scheme. The zero tolerance law was enacted to close the "loophole" which allowed persons under 18 years of age to drive a motor vehicle with a blood-alcohol content of less than 0.05 percent, and

allowed persons between 18 and 21 years of age to drive a motor vehicle with a blood-alcohol content of less than 0.08 percent.[6] In acting to close this loophole, the Legislature decided *not* to require a test other than the PAS test as a method of enforcement. Senate Bill No. 689 initially required an officer who had reasonable cause to believe that a person under 21 years of age had consumed alcohol to offer that person the opportunity to take a chemical test of his or her blood, breath or urine. (Sen. Bill No. 689 (1993-1994 Reg. Sess.) May 4, 1993.) If a chemical test was requested, the officer would then transport the person to the nearest authorized testing facility. (*Ibid.*) However, the California State Sheriff's Association opposed this version of the bill, "because the procedure proposed is 'lengthy, costly and time consuming.' " (*Ibid.*) The bill was subsequently amended to require only that the officer "request that the person take a preliminary alcohol screening test to determine the presence of alcohol in the person . . . ." (§ 23137, subd. (a).) Thus, the officer was no longer required to offer a chemical test or transport the person to an authorized testing facility. In this way, the process was streamlined, and officers could simply cite and release the zero tolerance law violators.

When first amendments to Senate Bill No. 689 were offered, the Legislature considered arguments regarding the reliability of the PAS test. "Are prosecuting attorneys able to establish sufficient foundation for admissibility of PAS devices? Are PAS devices so scientifically reliable that results are generally admissible in a criminal proceeding? Even though this bill relates to administrative proceedings as opposed to a criminal proceeding, should people lose a privilege based on evidence that may not generally be admissible, whose scientific reliability has not been demonstrated and which may not preserve an independent sample for testing? If the PAS [test] result is positive, but the person is not impaired enough to be arrested for driving under the influence, should the person be offered a chemical test for later use

---

[6]"The Legislature finds and declares all of the following: [¶] (a) The 'drinking age' in all 50 states is 21 years, and it is illegal in all 50 states for persons under that age to purchase or possess alcoholic beverages. [¶] (b) Currently, there is no penalty for persons under 18 years of age who drive a motor vehicle with a blood alcohol content of less than 0.05 percent, by weight; nor is there a penalty for persons between 18 and 21 years of age who drive a motor vehicle with a blood alcohol content of less than 0.08 percent, by weight. [¶] (c) Every year, drinking drivers under 21 years of age maim and kill other drivers or pedestrians, causing not only untold grief and suffering, but also causing unnecessary increases in automobile insurance rates. In 1990 alone, this group of drivers killed 60 Californians and injured an additional 1,591 persons. [¶] (d) It is the intent of the Legislature, in enacting this act, to close this loophole, thereby enhancing the safety of our highways, by prohibiting any person under 21 years of age from driving a motor vehicle for one year if that person drove with a blood-alcohol concentration of 0.01 percent or greater, as measured by a preliminary alcohol screening test." (Stats. 1993, ch. 899, § 1 (Sen. Bill No. 689).)

at the administrative hearing?" (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 689 (1993-1994 Reg. Sess.) July 13, 1993.)

Thus, the legislative history reveals a recognition of possible foundational problems associated with the PAS test. Despite this recognition, the Legislature did not impose any foundation requirements within the law, but left it as it was, specifically directing that the 0.01 percent threshold be gauged by a PAS test. In addition, prior to the 1994 amendments, section 23137, subdivision (a)(2) provided that "If a preliminary alcohol screening test device is not immediately available, this section shall not apply to a person between 18 and 21 years of age with a blood alcohol concentration of less than 0.08 percent, by weight, nor to a person under 18 years of age with a blood-alcohol concentration of less than 0.05 percent, by weight." The 1994 amendments deleted this provision, recognizing that it was duplicative, but still included the provision requiring that the licensee take a PAS test, if one "is immediately available." (§ 23137, subd. (a).)

The Senate Judiciary Committee considered and rejected certain amendments to the zero tolerance law. The committee comments, dated May 4, 1993, noted: "Amendments not to consider" "1. Raise to .02—cite and release wouldn't work. Officer would *have* to administer chemical test. . . ." (Italics in original.) By designating the PAS test as the proper testing device, and by keeping .01 as the threshold blood-alcohol level, the Legislature made clear that the zero tolerance law meant just that—zero tolerance. To this end, the Legislature directed that the PAS test be used to detect the presence of alcohol, rather than a particular quantification.

A PAS test reading of 0.01 is the functional equivalent of zero tolerance. A 0.01 reading represents the threshold level for the presence of alcohol in the blood. Under title 17 of California Code of Regulations section 1221.5, "Results of breath alcohol analysis shall be expressed as set forth in Section 1220.4." Section 1220.4, subdivision (b) states, "Analytical results shall be reported to the second decimal place, deleting the digit in the third decimal place when it is present." Section 1220.4, subdivision (c) provides that "Blood alcohol concentrations less than 0.01% in living subjects may be reported as negative."

Accordingly, it is a legal impossibility to express a blood-alcohol concentration below 0.01 percent. To do so would require reporting to the third decimal place. The provision that blood-alcohol concentration less than 0.01 percent shall be reported as negative is tantamount to recognizing that 0.01 percent is the threshold level for reporting the presence of alcohol.

From this history, it is clear the Legislature specifically mandated that the PAS test be used to enforce the zero tolerance law. The Legislature directed police officers to use the PAS test to detect the presence of alcohol in the blood. This Legislative direction shows the Legislature's approval of the reliability of the PAS test as a device for measuring the presence of alcohol in the blood. Given the Legislature's repeated reference to the PAS test within the zero tolerance law, and its repeated direction that the device be used to measure the presence of alcohol in the blood, rather than a particular blood-alcohol concentration, we conclude that the Legislature has found the PAS test to be a reliable method for enforcing the zero tolerance law.

## C. *Foundational Requirements*

Even though the Legislature has authorized the use of the PAS test, when a PAS test is used to subject the licensee to administrative penalties, it seems clear that there must be some basis for believing in the accuracy of the particular PAS device used to screen that licensee's blood for the presence of alcohol. ■ According to the trial court, the PAS device was required to comply with sections 1215 through 1222.2 of title 17 of the California Code of Regulations. Those sections set forth standards for forensic alcohol analysis and breath-alcohol analysis.[7] Article 7 of the rules sets forth the requirements for breath-alcohol analysis, including standards for procedures (Cal. Code Regs., tit. 17, §§ 1221.1, 1221.4) instrument performance standards (§ 1221.2), and approved instruments (Cal. Code Regs., tit. 17, § 1221.3). (Cf. *Davenport* v. *Department of Motor Vehicles* (1992) 6 Cal.App.4th 133, 142 [7 Cal.Rptr.2d 818].) "Compliance with the regulations establishes both a foundation for admission of test results into evidence in any proceeding and a basis for finding such results to be legally sufficient evidence to support the requisite findings in such proceeding." (*Ibid.*)

Under California Code of Regulations, title 17, section 1221.2, it is provided that instruments for breath-alcohol analysis "*shall* meet the following standard: [¶] (1) The instrument and any related accessories *shall* be capable of conforming to the 'Model Specifications For *Evidential Breath Testing Devices*' of the National Highway Traffic Safety Administration [NHTSA] of the U.S. Department of Transportation, which were published in the Federal Register, Vol. 49, No. 242, Pages 48854-48872, December 14, 1984, and are hereby adopted and incorporated." (Cal. Code Regs., tit. 17, § 1221.2, subd. (a)(1), italics added.)

It is well established that the use of the word "shall" in a statute or regulation is ordinarily construed as mandatory. (*Common Cause* v. *Board of*

---

[7]The standards were adopted pursuant to Health and Safety Code section 436.52.

*Supervisors* (1989) 49 Cal.3d 432, 443 [261 Cal.Rptr. 574, 777 P.2d 610]; *Long Beach Police Officers Assn.* v. *City of Long Beach* (1988) 46 Cal.3d 736, 743 [250 Cal.Rptr. 869, 759 P.2d 504].) Thus, under California Code of Regulations, title 17, section 1221.2, the breath-analysis instruments shall be capable of conforming to federal specifications for evidential breath testing devices (EBT's). Under 49 Federal Register 48854 (Dec. 14, 1984), EBT's are "instruments which measure the alcohol content of deep lung breath samples with sufficient accuracy for evidential purposes." In 1984, the NHTSA established specifications for the performance and testing of EBT's. (*Ibid.*) Under California Code of Regulations, title 17, section 1221.3, only instruments and related accessories named in the "Conforming Products List" published in the Federal Register by the NHTSA "shall be used for breath alcohol analysis in this State."

Is a PAS device an EBT? Was the type of PAS device used in this case on the NHTSA conforming products list? The record does not reveal the model of the PAS device used to test respondent. Moreover, we note that the NHTSA has recently published *separate* model specifications for the performance and testing of *alcohol-screening devices*, as opposed to EBT's. (59 Fed.Reg. 39382 (Aug. 2, 1994).) These specifications were established, in part to "support State laws that target youthful offenders (i.e., 'zero tolerance' laws). . . ." (*Ibid.*) The NHTSA noted that the model specifications for alcohol-screening devices differed from the specifications for EBTs, and that the new specifications are designed to "test whether devices are suitable for screening, not evidential, purposes. . . ." (*Ibid.*) The NHTSA specifications provide that such screening devices "use bodily fluids to detect the presence *of 0.020* or more BAC with sufficient accuracy for screening purposes." (*Ibid.*) Under the specifications, "bodily fluid" includes, but is not limited to, "blood, exhaled deep lung breath and saliva." (*Ibid.*)[8] With respect to the temperature range for testing, the screening device specifications are actually more severe than those imposed for EBT's. This is because tests performed with EBT's are usually performed indoors, while tests using screening devices may be performed "outside in widely varying temperature conditions." (*Ibid.*) Thus, even if the device used in this case matched the EBT conforming list, that fact would not establish that the model or brand used would perform properly when used outside in widely varying temperature conditions.

---

[8]The NHTSA specifications set the zero tolerance blood-alcohol threshold at 0.02, unlike California, where the level is 0.01. As noted previously, the California Legislature rejected an amendment to raise the threshold to 0.02. Thus, any attempt to utilize the NHTSA specifications for alcohol-screening devices must take into account this difference in the blood-alcohol threshold.

As is evident, the NHTSA has distinguished between EBT's and alcohol-screening devices. Under the NHTSA specifications, the screening devices "screen" for the *presence* of alcohol. Further, the NHTSA specifications were developed, in part, to support state zero tolerance laws. Thus, these alcohol-screening device specifications seem more consistent with California's zero tolerance law, since our law expressly refers to PAS devices, and expressly emphasizes that the PAS devices are to be used to detect the presence of alcohol, rather than a particular blood-alcohol concentration. On the other hand, under the zero tolerance law, the PAS test results are to be used for evidential purposes, since the PAS test is the method the Legislature has chosen to enforce the zero tolerance law.

After careful consideration, we do not believe title 17 of the California Code of Regulations applies to PAS devices. The title 17 regulations generally define "breath alcohol analysis" as an analysis of a breath sample, using a breath testing instrument, "in order to determine the *concentration* of ethyl alcohol in the person's blood." (Cal. Code Regs., tit. 17, § 1215.1, subd. (c), italics added.) As noted, the Legislature has mandated that the PAS device be used to detect the *presence* of alcohol, rather than a particular blood-alcohol concentration. Similarly, "instruments" or "devices" referred to within title 17 mean "any item or combination of items of equipment used to make a *measurement of alcohol concentration* . . . ." (*Id.*, § 1215.1, subd. (j), italics added.) Thus, the title 17 regulations appear focused upon a particular blood-alcohol concentration. The PAS device, on the other hand, is aimed at detecting the *"presence of alcohol* in the person . . . ." (§ 23136, subd. (c)(1), italics added.)

Moreover, Health and Safety Code section 436.52 provides that "The testing of breath samples by or for law enforcement agencies *for purposes of determining the concentration of ethyl alcohol in the blood* of persons involved in traffic accidents or in traffic violations shall be performed in accordance with regulations adopted by the State Department of Health Services. [¶] The rules and regulations shall establish the procedures to be used by law enforcement agencies in administering breath tests for the *purposes of determining the concentration of ethyl alcohol in a person's blood.* . . ." (Italics added.) Thus, section 436.52, which imposed a duty upon the State Department of Public Health to adopt the regulations set forth in title 17 of the California Code of Regulations specified that the regulations adopted would apply to breath tests used to determine the concentration of alcohol in a person's blood. Given that the PAS device is to be used to detect alcohol presence, rather than concentration, section 436.52 also supports our conclusion that title 17 does not apply to PAS devices.

California Code of Regulations title 17's reference to the conforming products list also supports our conclusion. As noted above, under California Code of Regulations, title 17, section 1221.3, only instruments and related accessories "named in the 'Conforming Products List'" "shall be used for breath alcohol analysis in this State." The reference to "conforming products list" refers to the list for EBT's, initially published in 1984, well before California's zero tolerance law was enacted, and therefore well before the Legislature had decided to use PAS devices as a method of proving a violation of the law. Given this fact, it is unlikely that the title 17 regulations were meant to apply to PAS devices.

The fact that the PAS device is not used as evidence of section 23140, 23152, or 23153 violations also indicates that PAS devices are not covered by California Code of Regulations title 17. Under section 23157, a PAS device may be used "as a further investigative tool" and to assist the officer in determining whether there is probable cause to arrest a person for violating section 23140, 23152, or 23153. (§ 23157, subd. (h)(1) and (2).)[9] Under section 23157, subdivision (h)(2), the Legislature has specifically provided that a person's obligation to take a blood, breath, or urine test is not satisfied by the fact that the person took a PAS test. Accordingly, if title 17 was meant to apply to PAS devices, then these limits upon their use would be unnecessary since the PAS devices would be subject to the same title 17 evidentiary regulations as devices used to conduct blood, urine, or breath tests.

In 1989, the Attorney General's Office concluded that California Code of Regulations title 17 did not apply to PAS devices: "The plain wording of Health and Safety Code section 436.52 requires . . . breath testing by law enforcement agencies to conform to the [title 17] regulations. The only

---

[9]Section 23157, subdivision (h) provides that "A preliminary alcohol screening test that indicates the presence or concentration of alcohol based on a breath sample in order to establish reasonable cause to believe the person was driving a vehicle in violation of Section 23140, 23152, or 23153 may be used only after the officer evaluates the totality of the circumstances, including the person's performance on the field sobriety tests and under both of the following conditions: [¶] (1) If a person refuses to take field sobriety tests or is incapable of taking the tests, the preliminary alcohol screening test may be used as a further investigative tool, unless the person refuses to take the preliminary alcohol screening test. [¶] (2) If the officer decides to use a preliminary alcohol screening test, the officer shall advise the person that he or she is requesting that person to take a preliminary alcohol screening test to assist the officer in determining if that person is under the influence of alcohol. The person's obligation to submit to a blood, breath, or urine test, as required by this section, for the purpose of determining the alcohol or drug content of that person's blood, is not satisfied by the person submitting to a preliminary alcohol screening test. The officer shall advise the person of that fact and of the person's right to refuse to take the preliminary alcohol screening test."

exception to the equipment and procedure requirements of the regulations for law enforcement use of breath tests are tests which do not determine the concentration of ethyl alcohol in the blood. A [preliminary breath test] device which only indicates the presence of ethyl alcohol without giving any indication of the concentration of alcohol in the sample would not be subject to the statute or regulations." (72 Ops.Cal.Atty.Gen. 226, 230 (1989).) The Attorney General's Office also concluded, "It is apparent that the [title 17] regulations were designed to regulate the gathering of evidence of the concentration of alcohol in the defendant's blood for use at his or her trial on drunk driving charges and did not contemplate the use of breath testing for such preliminary purposes as providing a peace officer with probable cause to believe a driver was under the influence of an alcoholic beverage which would justify the driver's arrest for drunk driving. . . . The regulations could authorize the use of different equipment and procedures on breath testing for preliminary purposes. . . ." (*Id.* at pp. 231-232.)

From the foregoing, we conclude that California Code of Regulations title 17 does not apply to PAS devices. The emphasis upon blood-alcohol concentration as opposed to the presence of alcohol in the blood, the fact that PAS devices have a limited evidentiary value in prosecuting driving under the influence violations, the reference to the NHTSA specifications for EBT's, and the reference to the companion conforming products list, which was established before the zero tolerance law was enacted, all indicate that the title 17 regulations were not meant to cover PAS devices.

 Having decided that the California Code of Regulations title 17 regulations do not apply to the PAS test, we must determine how the reliability of the PAS device is to be tested. Since the Legislature has directed the police to use the PAS device to determine the presence of alcohol in the blood, we believe that the legislative mandate provides an unambiguous basis for believing that the PAS test is, in general, a reliable way to enforce the zero tolerance law. However, the reliability of the particular PAS device used in a particular case must still be proved. An officer's sworn statement that, when tested, a licensee's PAS test showed the presence of alcohol in the licensee's blood is legally sufficient evidence "if and only if there is a basis for believing that the test which [detected] blood alcohol was reliable." (*Davenport* v. *Department of Motor Vehicles, supra,* 6 Cal.App.4th at p. 140.) "In general, the foundational prerequisites for admissibility of testing results are that (1) the particular apparatus utilized was in proper working order, (2) the test used was properly administered, and (3) the operator was competent and qualified." (*People* v. *Adams* (1976) 59 Cal.App.3d 559, 561 [131 Cal.Rptr. 190]; see

also *Davenport, supra*, 6 Cal.App.4th 133, 140; *Coombs* v. *Pierce* (1991) 1 Cal.App.4th 568, 576 [2 Cal.Rptr.2d 249].) For the PAS test results to be admissible to show a zero tolerance law violation, these requirements must be satisfied. It is the DMV's burden to show that the requirements are met. (Cf. *Santos* v. *Department of Motor Vehicles, supra*, 5 Cal.App.4th at p. 549.)

Due process demands no less. ■ "When the state acts to deprive a citizen of a protectible property right, thus triggering due process protections, the issue of what process is due is determined by balancing the following factors: (1) the private interest affected by the official action; (2) the risk of the erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; (3) the dignity interest in informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible government official and (4) the governmental interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedural requirements would entail." (*Davenport* v. *Department of Motor Vehicles, supra*, 6 Cal.App.4th at pp. 143-144, citing *In re Malinda S.* (1990) 51 Cal.3d 368, 383 [272 Cal.Rptr. 787, 795 P.2d 1244]; *In re Jackson* (1987) 43 Cal.3d 501, 510-511 [233 Cal.Rptr. 911, 731 P.2d 36].)

■ Applying these considerations to the zero tolerance law, we note the following. A violation of the zero tolerance law subjects the violator to civil penalties. Violating the zero tolerance law is neither an infraction nor a public offense, as defined within section 15 of the Penal Code. In addition, since the process is administrative, the evidentiary standards are somewhat relaxed. (Gov. Code, § 11513, subd. (c).) It is permissible for the state to resort to summary suspension proceedings to regulate the use of the driving privilege and to protect the public against its abuse. (*Davenport* v. *Department of Motor Vehicles, supra*, 6 Cal.App.4th at p. 139.) However, a driver's license is still a protectible property interest. (*Ibid.*) The considerations "justifying summary proceedings are not so great as to allow the suspension of a license absent a showing by substantial competent evidence of facts supporting the suspension." (*Ibid.*) Moreover, attacking the reliability of the PAS test may be the licensee's only real way of defending against a zero tolerance law violation. To conclude that the DMV need not establish a foundation for the admission of the PAS tests would severely hamper the licensee's ability to defend.

■ "In proceedings to suspend or revoke a driver's license, the facts necessary to justify suspension can be established by the use of the sworn

statement of the arresting officer, attesting to matters within the officer's personal knowledge, even though the officer does not personally appear and the licensee offers contrary proof. [Citations.] However, it does not necessarily follow from the mere fact that the officer's sworn statement is admissible and competent evidence under an exception to the hearsay rule that every matter in the sworn statement is admissible and legally sufficient to support a finding. Each matter sworn to must itself be supported by an adequate foundation of personal knowledge by the officer and any other appropriate guarantee of reliability, or that matter is not admissible and cannot be relied upon. [Citations.]" (*Davenport* v. *Department of Motor Vehicles, supra,* 6 Cal.App.4th at pp. 139-140.)

"An officer's sworn statement that, when tested, a licensee's BAC [blood-alcohol concentration] was at a particular level is admissible, legally sufficient evidence that the BAC was indeed at that level if and only if there is a basis for believing that the test which measured blood alcohol was reliable. In general, the foundational requirements for establishing the reliability of test results consist of a showing that (1) the apparatus utilized was in proper working order, (2) the test used was properly administered, and (3) the operator was competent and qualified." (*Davenport* v. *Department of Motor Vehicles, supra,* 6 Cal.App.4th at p. 140.)

In *Davenport,* the court noted that blood-alcohol tests admitted as evidence in a section 13558 hearing must comply with California Code of Regulations title 17. Under Evidence Code section 664, there is a presumption that official duty has been regularly performed. Relying upon this "official duty" presumption, the *Davenport* court held that there is a rebuttable presumption that blood-alcohol tests reported upon official forms were obtained in compliance with governing statutes and regulations, namely title 17. (6 Cal.App.4th at p. 142.) The burden is then upon the licensee to show the "nonexistence of the foundational trustworthiness of the report as a whole, and in particular, the nonexistence of the foundational reliability of tests upon which the report is partly based." (*Id.* at p. 143; see also *McKinney* v. *Department of Motor Vehicles* (1992) 5 Cal.App.4th 519, 525 [7 Cal.Rptr.2d 18]; *Imachi* v. *Department of Motor Vehicles* (1992) 2 Cal.App.4th 809, 816-817 [3 Cal.Rptr.2d 478].)

Of course, in this case, we cannot rely upon the "official duty" presumption. As we've already discussed, California Code of Regulations title 17 does not apply to the PAS test. Thus, there are no "governing statutes or regulations" regulating the testing and reliability of the PAS test. In the

absence of such regulations, we cannot presume that the PAS test results are reliable.[10] Thus, it is the DMV's burden to show that the PAS test meets general foundational requirements. (*Santos* v. *Department of Motor Vehicles, supra,* 5 Cal.App.4th at p. 549.) Again, those requirements consist of a showing that "(1) the apparatus utilized was in proper working order, (2) the test used was properly administered, and (3) the operator was competent and qualified." (*Davenport* v. *Department of Motor Vehicles, supra,* 6 Cal.App.4th at p. 140.)[11]

In this case, Officer Short testified that the device was issued to him in November or December of 1993. Officer Short said the device was brand new at that time. He received approximately two hours of training covering the operating procedures and the manual of the PAS device. Officer Short testified that the device has an internal calibration mechanism that advises the user if the device is not operable. The device requires calibration service about once a year. Officer Short testified that the manufacturer's representative found his particular device to be in calibration at the police chief's conference held in February of 1994. Officer Short stated that the PAS results are extremely close and consistent with the legal blood, urine or breath test results that are obtained in driving under the influence arrests.

This showing did not establish the reliability of the PAS device used to test respondent. First, the testimony did not show the apparatus was in proper working order. There was no testimony about how the device was

---

[10]A number of states permit use of PAS test results only as an aid in determining probable cause for arrest. (See, e.g., *People* v. *Rose* (1994) 268 Ill.App.3d 174 [205 Ill.Dec. 574, 643 N.E.2d 865, 867]; *People* v. *Thomas* (1986) 121 A.D.2d 73 [509 N.Y.S.2d 668, 672]; *City of Fargo* v. *Ruether* (N.D. 1992) 490 N.W.2d 481, 483; *State* v. *Deshaw* (Iowa 1987) 404 N.W.2d 156, 157; *Boyd* v. *City of Montgomery* (Ala. 1985) 472 So.2d 694, 697; *State* v. *Orvis* (1983) 143 Vt. 388 [465 A.2d 1361, 1362-1363]; see also Nichols, Drinking/Driving Litigation: Criminal and Civil (1985) § 11:06, pp. 12-13; but see *Bokor* v. *Dept. of Licensing* (1994) 74 Wn.App. 523 [874 P.2d 168] [results not admissible to show probable cause].)

[11]In appellant's brief, it argues that the PAS device is reliable, and makes comments about the "fuel-cell" technology used. We are not persuaded. First, as already noted, there is nothing in the record to show what particular type of PAS device was used here. Second, even if this was a "fuel-cell" device, at least one commentator has noted that these type of PAS devices pose problems because of their lack of specificity for ethanol. Hydrocarbons other than ethanol, such as methane, carbon monoxide, acetaldehyde, and gasoline fumes, can be oxidized in a fuel cell. Oxidation of these nonethanol hydrocarbons will cause a measurable current, just as with ethanol. Thus, a false positive reading is possible. Although it has been argued that none of these other substances, alone, could give a false positive reading of blood-alcohol content, this argument does not consider the potential additive effect of these substances, either working alone or in combination. Thus, although the nonethanol substances may independently produce a reading below the legal threshold, if those substances combine with a borderline blood-alcohol content, a false positive could conceivably be produced. In any event, we simply note that the reliability of such devices appears subject to some dispute. (Nichols, Drinking/Driving Litigation: Criminal and Civil, *supra,* § 26:10, p. 21.)

maintained or whether the standards for calibration were established. Officer Short's testimony that he was told by someone else in February 1994 that the device was properly calibrated is insufficient. Second, there was no evidence showing that the test was properly administered, or evidence explaining how the PAS device should be administered. Finally, the testimony did not prove that Officer Short was competent and qualified. Officer Short's training consisted of only two hours, covering the training manual and operating procedures of the device. As the trial court noted, "[Officer Short's] training certainly wasn't what the normal officers will receive in the use of these devices." In addition, when questioned, Officer Short testified that there were no records relating to the machine, and admitted that "[he didn't] know scientifically if the mechanism in there was functioning properly. . . ." Officer Short was asked, "All you know is you turned it [the PAS device] on and the little digits came up, you blew in it and something happened, is that correct?" Officer Short responded, "Correct." Accordingly, we conclude that the reliability of the PAS test was not established.

### Disposition

The judgment granting respondent's petition for a writ of mandate is affirmed.

Premo, Acting P. J., and Mihara, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 24, 1996.