[Crim. No. 16439. First Dist., Div. Two. Jan. 19, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD WAYNE FRENCH, Defendant and Appellant.

516

**Counsel**

Rick L. Ames, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Clifford K. Thompson, Jr., and Charles R. B. Kirk, Deputy Attorneys General, for Plaintiff and Respondent.

**Opinion**

**TAYLOR, P. J.**—Defendant, Ronald W. French, appeals from a judgment entered on a jury verdict finding him guilty of driving while under the influence of alcohol (Veh. Code, § 23102, subd. (a)) and vehicular manslaughter (Pen. Code, § 192, subd. (3)(b)). He contends on this appeal that the trial court committed prejudicial error by admitting into evidence the results of a breath alcohol test, and that there was insufficient evidence of negligence to support the verdict and judgment. For the reasons set forth below, we reject both of these contentions and affirm the judgment.

The basic facts are not in dispute. The record indicates that after 11 p.m. on May 8, 1976, defendant struck a bicycle ridden by Richard (Rocky) Kardum, 13, who died as a result of the sustained injuries. The accident was witnessed by Rocky's cousin, Gary Kardum, 16, who was also riding a bike on the shoulder of the road. As Gary swerved to avoid

a fast-moving car, he saw it strike Rocky's bike, and saw his cousin's body fly through the air. Gary heard the car continue down the road for several hundred feet until it stopped. As Sonoma Deputy Sheriff Cox radioed for an ambulance, defendant staggered toward him. Defendant's eyes were glassy and bloodshot, he reeked of alcohol, and his speech was slurred. He admitted driving the car that struck Rocky and admitted that he had about three drinks "down around the corner," where he started drinking about 7 p.m. Defendant refused to tell the officers where he had been drinking.

After defendant failed several field sobriety tests,[1] he was taken to the Sonoma County jail where he elected to take a breath test. The intoxilyzer[2] maintained there by the State Department of Justice (DOJ) rendered a first reading of .19, using the single breath method,[3] a second reading of .16 using the multi-breath method and a third reading of .17 also using the multi-breath method.[4] In between each reading, the intoxilyzer is purged by the air blank method.[5] In clearing the machine by the air blank method between the first and second readings, an erroneous reading of .01 was printed by the intoxilyzer. This erroneous reading, as well as the results of the tests, were admitted into evidence over defense objections.

---

[1]Defendant was not able to walk heel to toe, stand on one foot, count backwards, stand at a modified position of attention, or touch the tip of his nose with his eyes closed.

[2]The function of this instrument was described by this court (Division Three) in *People v. Miller*, 52 Cal.App.3d 666, at pages 668-669 [125 Cal.Rptr. 341] as follows: "That device produces test material which can be retested if preserved. The intoxilyzer, however, produces no such material. The subject's breath is captured in a metal chamber, infrared energy of fixed intensity and wave length is passed through the chamber from one side to a photo-electric cell on the other side. Alcohol absorbs light of the fixed wave length. The device computes the loss of energy, translates the result in terms of the grams of alcohol per 100 milliliters of blood, and prints the result upon a card. In the prescribed operation of the device, clear air is first tested, then the breath of the subject. The chamber is then purged by blowing clear air through it, the clear air is tested, and all three results appear upon the printout card. The two tests of clear air constitute a test of the machine, and should show zero alcohol content."

[3]For the single or long breath method, the subject is required to blow for 11 seconds into an air tube connected to the breath collection chamber. During this time, the green light of the breath indicator lamp must be kept lit, to indicate that the subject is blowing with sufficient pressure to constitute a valid sample.

[4]Pursuant to Vehicle Code section 23126, subdivision (a)(3), an individual is under the influence of alcohol when the blood alcohol level is above .10.

[5]By this procedure, the air breath tube is connected to the pump tube, which automatically pumps clean air through the breath collection chamber for 35 seconds. At the end of this cycle, the intoxilyzer reads the air in the chamber and prints the result on a test card. The result should be .00.

Defendant's inability to perform the field sobriety tests was consistent with the intoxilyzer test results. All three breath test results were above the level where a person's ability to drive safely would be impaired. Defendant's expert Manwaring, a pathologist, opined that the intoxilyzer test results were unacceptable as scientifically inaccurate and beyond the limits of accuracy established by the applicable regulations of the State Department of Health (DOH). Defendant's expert Demorest, a forensic alcohol analyst, believed that the instant test results were scientifically unacceptable, but within the accuracy limits of the DOH regulations. Demorest performed an alcohol tolerance test on defendant using five ounces of 80 proof whiskey and ascertained that defendant was under the influence of alcohol when his blood alcohol level was .12.

Defendant's witness Butts, a part-time bartender at a cocktail lounge a few miles from the accident, indicated that defendant had no more than three drinks on the evening of May 9. Butts saw nothing about defendant's behavior to indicate that he had had too much to drink. On cross-examination, Butts indicated that his then employer was being sued about his involvement in Rocky's death.

The DOJ's expert Corazza explained the discrepancy between the .19 single breath reading and the .16 and .17 multi-breath readings as the natural result of comparing single with multi-breath readings. Corazza opined that the error which resulted in a .01 result after the air bank clearing following the first reading inured to defendant's benefit as the error reduced defendant's actual blood alcohol level on the second test by .01. The .01 inconsistency between the second and third readings could not be attributed to the intoxilyzer, which functioned properly both before and after the test on defendant.

Defendant's major contention on appeal is that the trial court committed reversible error by admitting into evidence the results of the intoxilyzer breath test administered to him by Officer Mayfield. Defendant argues that the test was inadmissible as Mayfield had failed to comply with the regulations governing the procedure for conducting the test. The pertinent rules concerning the breath test are contained in the DOJ's operator's manual (DOJ Manual) or checklist and in the DOH regulations.

The DOJ checklist requires the operator to purge the breath-collection chamber of alcohol after each breath sample to obtain a reading of .00 to indicate that no alcohol remains in the chamber to affect the accuracy of

the test. As indicated above, after the first of three breath samples was taken from defendant, Mayfield purged the chamber but obtained a reading of .01. This reading indicated that a small amount of alcohol remained. However, rather than conducting another purge test to clear the chamber of this small amount of extraneous alcohol and obtain a reading of .00, Mayfield continued with the tests.

■ Defendant first argues that the DOJ checklist constitutes a regulation and, therefore, Mayfield's failure to follow it completely by getting a reading of .00 before continuing with the test, rendered the second and third test results inadmissible. However, the DOJ checklist is not an "agency regulation" within the language of Government Code section 11371, subdivision (b), set forth below,[6] that defines a regulation as "every rule . . . adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it. . . ." A regulation, as defined by Government Code section 11371, can be adopted only where there has been a statutory grant of authority (Gov. Code, § 11373), set forth below.[7] (*Ralph's Grocery Co.* v. *Reimel,* 69 Cal.2d 172 [70 Cal.Rptr. 407, 444 P.2d 79]). The DOJ checklist has not been adopted pursuant to a statute enforced or administered by DOJ, as the exclusive statutory authority to promulgate regulations concerning breath testing has been delegated to the DOH by Health and Safety Code section 436.50, set forth below.[8] At oral argument, defendant argued that the DOJ checklist was not within the purview of Government Code section 11373, as it came within the exceptions of Govern-

---

[6]"In this chapter unless otherwise specifically indicated:

"(b) 'Regulation' means every rule, regulation, order, or standard of general application or the amendment, supplement or revision of any such rule, regulation, order or standard adopted by any state agency to *implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one which relates only to the internal management of the state agencies.* 'Regulation' does not mean or include any form prescribed by a state agency or any instructions relating to the use of the form, but this provision is not a limitation upon any requirement that a regulation be adopted pursuant to this part when one is needed to implement the law under which the form is issued." (Italics added.)

[7]"Except as provided in Section 11409, nothing in this chapter confers authority upon or augments the authority of any state agency to adopt, administer, or enforce any regulation. *Each regulation adopted, to be effective, must be within the scope of authority conferred and in accordance with standards prescribed by other provisions of law.*" (Italics added.)

[8]"On or before July 1, 1970, the State Department of Health shall adopt and publish such rules and regulations to be used in approving and governing the operation of laboratories engaging in the performance of tests referred to in Sections 436.51 and 436.52, including the qualifications of the employees of such laboratories who perform such tests, as it determines are reasonably necessary to insure the competence of such laboratories and employees to prepare, analyze, and report the results of such tests. The

ment Code section 11380, subdivision (a)(3), set forth below.[9] (Cf. *American Friends Service Committee* v. *Procunier,* 33 Cal.App.3d 252, 259-262 [109 Cal.Rptr. 22].) This argument cannot be raised for the first time on appeal[10] and, therefore, need not be discussed here.

■ In any event, failure to follow the DOJ checklist was harmless error because the evidence showed that the resultant reading on the intoxilyzer was .01 lower than the actual amount of alcohol in defendant's breath and, therefore, favorable to him. In any event, all of the blood alcohol readings were well above the .10 level at which an individual is presumptively under the influence of alcohol, pursuant to Vehicle Code section 23126, subdivision (a)(3).

■ Defendant next argues that Mayfield violated the purpose and intent of a DOH regulation which requires two breath samples to be taken that are within .02 of each other (Cal. Admin. Code, tit. 17, § 1221.4, subd. (a)(1), set forth below).[11] Defendant chooses to interpret the requirement of two separate breath samples of this regulation to preclude taking repeated breath samples until two samples agreeing by .02 or less are obtained. He argues that to permit innumerable samples in order to meet the .02 tolerance limit would defeat the regulation's purpose of ensuring accurate and reliable measurements from two separate breath samples. As indicated above, both defense experts supported this view, while the state's expert testified that the test procedure was consistent with the DOH regulation.

---

rules and regulations shall be adopted, only after the State Department of Health has consulted with at least one member of each of the following groups: district attorneys, public defenders, coroners, criminalists, pathologists, analytical chemists, and such other persons deemed by the department to be qualified."

[9]"Every state agency shall:

"(a) Transmit to the department for filing with the Secretary of State and with the Rules Committee of each house of the Legislature a certified copy of every regulation adopted by it except one which: . . .

"(3) Is directed to a specifically named person or to a group of persons and does not apply generally throughout the state."

[10]This argument raises complex issues that were not presented below (see, for example, *Agricultural Labor Relations Bd.* v. *Superior Court,* 16 Cal.3d 392 [128 Cal.Rptr. 183, 546 P.2d 687]; *California Optometric Assn.* v. *Lackner,* 60 Cal.App.3d 500 [131 Cal.Rptr. 744]).

[11]"(a) Procedures for breath alcohol analysis shall meet the following standards:

"(1) For each person tested, breath alcohol analysis shall include analysis of 2 separate breath samples which result in determinations of blood alcohol concentrations which do not differ from each other by more than 0.02 grams per 100 milliliters."

The record on appeal includes a memorandum signed by the assistant chief counsel of DOH, of which we may take judicial notice pursuant to Evidence Code section 452, subdivision (b).[12] (*People* v. *Terry*, 38 Cal.App.3d 432 [113 Cal.Rptr. 233].) This memorandum confirms Corazza's testimony that pursuant to the agency's current official practice, the above DOH regulation is satisfied if any two test values are within .02 of each other, regardless of the number of samples taken. The DOH memorandum further explains that the number of tests given does not matter because the purpose of its regulation was to ensure that alveolars of "deep lung" air samples have been obtained. A sample which is not entirely deep lung air is diluted by fresh air or mouth air and thus gives an erroneously low indication on the intoxilyzer. Corazza explained that several samples are taken to achieve the correlation of .02, so that the subject can be released from further testing. If the correlation cannot be obtained, other types of tests are administered.

■  The interpretation given a regulation by the administrative agency charged with its enforcement is entitled to great weight (*People* v. *Ruster,* 16 Cal.3d 690, 697 [129 Cal.Rptr. 153, 548 P.2d 353]; *Carmona* v. *Division of Industrial Safety,* 13 Cal.3d 303 [118 Cal.Rptr. 473, 530 P.2d 161]). This is particularly true where, as here, a potential ambiguity appears (*Bank of Alameda County* v. *McColgan,* 69 Cal.App.2d 464 [159 P.2d 31]). ■  The language of the regulation refers to two separate breath samples without requiring that these samples be consecutive. Although defendant's reading of only two simultaneous samples is a reasonable one, pursuant to the above rule, the wisdom and scientific propriety of a regulation is better addressed to the expert agency administering it than to this court (*Pitts* v. *Perluss,* 58 Cal.2d 824 [27 Cal.Rptr. 19, 377 P.2d 83]). ■  Defendant's argument that DOH's interpretation of this regulation that allows innumerable tests until the correlation is obtained violates substantive due process,[13] is of no pertinence here, as only two consecutive multi-breath tests were made. ■  Accordingly, we conclude that the determination of Corazza and DOH that the procedure used by Mayfield here to obtain

---

[12]Copies of this memorandum were served on both parties on October 18, 1977. Defendant raised no objection until the oral argument on December 13, 1977. However, we feel the DOH practice is important to the disposition of the case and would have requested the memorandum if it had not already been supplied to us (cf. *People* v. *Ruster,* 16 Cal.3d 690, fn. 2, at p. 697 [129 Cal.Rptr. 153, 548 P.2d 353]). We, therefore, take judicial notice of the same on our own motion pursuant to Evidence Code section 452, subdivision (b).

[13]This argument was made for the first time at oral argument and in defendant's written response to the DOH memorandum.

readings within .02 of each other was reasonable, was not in violation of the DOH regulation, quoted above, and also did not violate substantive due process.

Thus, defendant's contention that the test was inadmissible because administered in a manner violative of a regulation that has the force of law is entirely without merit. ■ Furthermore, even assuming without conceding, that the DOH regulation was violated in conducting the test, the trial court properly exercised its discretion in admitting the test results. ■ Evidence obtained in violation of a statute or regulation is not made inadmissible per se unless there is a constitutional dimension to the violation.[14] Rather, noncompliance goes only to the weight of the evidence (*People* v. *Adams,* 59 Cal.App.3d 559 [131 Cal.Rptr. 190]; *People* v. *Brannon,* 32 Cal.App.3d 971 [108 Cal.Rptr. 620]; *People* v. *Rawlings,* 42 Cal.App.3d 952 [117 Cal.Rptr. 651]). ■ Despite the weight of authority contrary to his position, defendant argues that the prevailing rule is incorrect and should not be followed by this court. He cites *People* v. *Foulger,* 26 Cal.App.3d Supp. 1 [103 Cal.Rptr. 156], and the dissenting opinion of Justice Rattigan in *People* v. *Adams, supra,* 59 Cal.App.3d 559. However, *Foulger* has been disapproved in the three Court of Appeal opinions cited above, including *People* v. *Adams.* We have reviewed the majority and dissenting opinions and are convinced that the *Adams* majority rule is the proper one. The rule permits the admission of highly relevant and competent evidence on the issue of intoxication, while at the same time safeguarding the defendant's rights. ■ Pursuant to the *Adams* rule, a defendant can attack the "credibility" of the test by showing that normal testing procedures were not followed, the operator was not properly qualified, or that the machine was unreliable. ■ Defendant here had an opportunity at trial to attack the intoxilyzer test given him, and did so. For this same reason, we must reject defendant's contention that admission of the intoxilyzer results was inherently prejudicial because the jury might have given them undue weight as a "scientifically controlled" test. We also note that even in the absence of the intoxilyzer test results, the record contains ample substantial evidence of defendant's highly intoxicated condition immediately after the accident. His slurred speech, staggering, behavior and inability to perform the field tests were corroborated by several police officers.

■ We turn next to defendant's second major argument on appeal that there is insufficient substantial evidence to support the jury's verdict

---

[14] As indicated above, the substantive due process contention has little pertinence here.

that he violated Vehicle Code section 23102, subdivision (a), and Penal Code section 192, subdivision (3)(b).

We need not discuss in detail his argument that there was insubstantial evidence to support the verdict of driving while under the influence of alcohol (Veh. Code, § 23102, subd. (a)), as it is predicated on the admissibility of the breath test results. We merely note that result of the breath test by itself is sufficient for conviction if accepted by the jury. As indicated above, here, even in the absence of the result of the breath tests, there was overwhelming evidence that defendant was under the influence of alcohol at the time of the accident. It is not the function of this court to reassess credibility of the witnesses; that is the exclusive function of the trier of fact.

■ We turn, therefore, to defendant's contention that there is no substantial evidence to support the verdict as to Penal Code section 192, subdivision (3)(b), which requires: (1) either a showing that the defendant committed an unlawful act, or a lawful act which might produce death in an unlawful manner, but without gross negligence; and (2) that the homicide be the "proximate result" of the unlawful act or of the lawful act committed in an unlawful manner.

Defendant argues that since there was no substantial evidence to support a conviction pursuant to Vehicle Code section 23102, subdivision (a), then there was no "unlawful act" to serve as a basis for the conviction pursuant to Penal Code section 192, subdivision (3)(b). This contention is entirely without merit and requires no discussion in view of our above holding that there was ample substantial evidence to support a verdict of guilty pursuant to Vehicle Code section 23102, subdivision (a).

■ Finally, defendant asserts that the People have not sustained their burden of showing that Rocky's death was the proximate result of defendant's conduct. Defendant claims that the accident was unavoidable and would have occurred even absent any negligence or unlawful act on his part (*People* v. *Scola,* 56 Cal.App.3d 723 [128 Cal.Rptr. 477]). This contention is predicated on his testimony that he was driving, at the most, at a speed of 35-40 miles an hour. This testimony was corroborated by Sergeant Humes of the highway patrol who examined the scene of the accident, Rocky's bicycle, and photographs of the accident, the absence of skid marks and his accident reconstruction experts. Defense

expert Hight indicated that with the auto lights on low beam, the bicycle reflectors could be seen 150 feet away; without reflectors, the bicycle could not be seen until the car was 100 feet away, and the driver could not tell that it was a bicycle until he was 50 feet away.

Gary indicated that prior to their departure, he noticed that the rear reflector on Rocky's bicycle was bent inward. He bent it out so it would face the rear. Rocky was lying about 100 feet from the point of impact; his bicycle with its seat, bag and reflector missing were 3 feet from him. Defendant's car was about 250 feet from the point of impact, with the windshield broken out and the right front portion of the hood dented. A thorough search of the area after the accident and the following day revealed no more parts of the bicycle; the bicycle seat and bag were found by a neighbor and turned over to the police shortly before the trial in November 1976. The red reflector was never found.

■ "The determination of whether defendant's unlawful act or acts were a proximate cause of the death is a question for resolution by the trier of fact (see *People* v. *Lewis,* 152 Cal.App.2d 824, 828-829 [313 P.2d 972]) and is determined according to the ordinary principles governing proximate causation. (Witkin, Cal. Crimes, [*supra,*] § 347; CALJIC No. 8.93.)

"A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability. (Witkin, Cal. Crimes, *supra,* §§ 80, 82, 83.) '(1) The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. (2) The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act.' (Witkin, Cal. Crimes, *supra,* § 84.)" (*People* v. *Harris,* 52 Cal.App.3d 419, 427 [125 Cal.Rptr. 40].)

■ The evidence here indicated that defendant, while driving at a relatively low rate of speed while intoxicated, hit Rocky's bike. Rocky, like Gary, was riding on the shoulder of the road. Rocky's bike had a red reflector that defendant failed to see in time. Defendant's car apparently swerved off the road as Gary moved to avoid him. Thus, defendant's severely impaired driving ability was a cause that in natural continuous

sequence produced Rocky's death and without which that death would not have occurred (*People* v. *Harris, supra*).

The judgment is affirmed.

Kane, J., and Rouse, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 30, 1978.