107 Cal.Rptr.2d 135 (2001)
89 Cal.App.4th 85
The PEOPLE, Plaintiff and Respondent,
v.
Steven Vaughn WILLIAMS, Defendant and Appellant.
No. C031921.
Court of Appeal, Third District.
May 17, 2001.
Review Granted September 12, 2001.
*136 Linda J. Zachritz, under appointment by the Court of Appeal, Fresno, for Defendant and Appellant.
Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Senior Assistant Attorney General, John A. O'Sullivan, Supervising Deputy Attorney General, and Charles A. French, Deputy Attorney General, for Plaintiff and Respondent.
NICHOLSON, Acting P.J.
Defendant Steven Vaughn Williams appeals his conviction by jury of driving while under the influence of alcohol and while his driving privileges were suspended. Evidence was admitted at trial of the results of a field sobriety test known as a Preliminary Alcohol Screening ("PAS") test. Defendant claims the results of his PAS test were (1) inadmissible as substantive evidence of intoxication; (2) inadmissible because the test was not administered in compliance with governing state regulations; and (3) prejudicial and should have been excluded under Evidence Code section 352. Although admitting the PAS test results was error in this instance due to the number and magnitude of regulatory violations, we conclude the error was harmless and affirm the judgment.

PROCEDURAL HISTORY
An information filed January 7, 1998, charged defendant with committing the following crimes:
Count 1: Driving under the influence (Veh.Code, § 23152, subd. (a)).[1] In addition, defendant had suffered three prior convictions for driving under the influence, one in 1991 and two in 1997, within the meaning of former section 23175;
Count 2: Driving while privileges suspended (§ 14601.5, subd. (a)). In addition, the offense occurred within five years of two prior convictions of driving on a suspended license (§ 14601, subd. (b)(2)).
On August 4, 1998, defendant filed a motion to suppress evidence against him, including the results of the PAS test, pursuant to Penal Code section 1538.5. The trial court denied defendant's motion on September 3, 1998.
*137 At the beginning of trial, December 8, 1998, defendant moved in limine to exclude the PAS test results. The trial court denied the motion. Upon the People resting their case, defendant again moved to exclude the PAS test results, this time pursuant to Evidence Code section 352. The court denied the motion.
On December 23, 1998, the jury found defendant guilty on both counts.
On January 22, 1999, the trial court sentenced defendant to state prison for the upper term of three years on count 1 and a concurrent term of six months in the county jail on count 2.
Defendant timely filed a notice of appeal on February 19,1999.

FACTS
On the evening of December 27, 1997, Gary Pickle noticed his neighbors were having a party. At approximately 10:00 p.m. that night, Pickle saw someone drive an older Chevy pickup down his driveway, spin the vehicle in a circle very fast, then drive away (a maneuver Pickle called a "brodie"). This happened about every 30 minutes over a two- or three-hour period. Pickle recognized the pickup as one generally driven by defendant. On this night, however, Pickle could not see who was driving.
Frustrated, Pickle walked to the residence where the party was occurring. He confronted three gentlemen near the pickup, one of whom was defendant. Pickle asked them to stop driving down his driveway. Defendant was agitated and upset. The party's host described defendant as being "pretty drunk" at that time. Approximately 15 minutes later, someone again drove the truck down Pickle's driveway, spun around, and left. At that point, Pickle called the police. It was approximately 1:45 a.m., December 28,1997.
Arriving at the scene at approximately 2:00 a.m., Shasta County Deputy Sheriff Vickie Scocca observed a pickup truck parked on the side of the road with its engine running and its headlights on. Scocca observed a person in the truck ducking down underneath a blanket. The subject then got out of the truckit was defendant. His clothes were disheveled, his fly was open, and he had an odor of alcohol about him. He appeared intoxicated to Scocca. Defendant told Scocca he was out delivering Christmas presents. Scocca was of the opinion defendant could not safely drive a motor vehicle at that time.
A few minutes after Scocca arrived at the scene, California Highway Patrol Officers Jonathan D'Arcy and Douglas Barrett arrived at the scene to assist. Defendant told D'Arcy he had a limp and stuttered. Defendant had a strong odor of alcohol emitting from his breath, bloodshot watering eyes, and slurred speech. Defendant said he drank four beers, the first at 1:00 p.m. the previous afternoon, the last at 2:00 a.m. that morning. D'Arcy administered two field sobriety tests to defendant. Defendant failed each.
D'Arcy then administered a third field sobriety test, the PAS test. To perform this test, D'Arcy used a device known as an Alco Sensor IV which had been assigned to his partner. For this test, the subject breathes into the device. According to the officers, the device gives out a blood-alcohol content measurement based on the subject's deep lung air. D'Arcy had previously been trained to perform the PAS and had used the Alco Sensor IV device well over 100 times. The device appeared to be functioning properly that morning, and he administered the test as he had been trained to do.
D'Arcy advised defendant he was under no obligation to take the PAS test. Defendant *138 consented to taking the test. D'Arcy explained the device's operation to defendant and showed him how it worked. He showed defendant the device's readout of "000," indicating the device was running an "air blank" to clear itself and ensure there was no alcohol residue from a previous test. Defendant took the test. D'Arcy showed defendant the device's measurement: .181.
Based on defendant's performance on the three field tests and his observations of defendant, D'Arcy concluded defendant was under the influence of alcohol and unable to operate a motor vehicle safely. He arrested defendant. Defendant refused to submit to a chemical test.
California Highway Patrol Officer Stephen Hoxie calibrates PAS test instruments. Although he referred to the process as calibration, he stated the process actually concerns testing the instrument's accuracy to make sure its readings are within tolerances specified by regulation. To do this, Hoxie runs the device on a "wet simulator" using a solution rated from the laboratory to have an alcohol content of .10. If the Alco Sensor IV reads this solution as having an alcohol content within the range of .09 and .11, it is considered to be operating within an acceptable range of performance. If it is not, the device must be adjusted, or calibrated, and tested again.
Hoxie testified as the custodian of records of the calibration log maintained on Barrett's PAS device. The Highway Patrol's operating procedure was to test PAS devices every 10 days or every 150 uses, as required by California Code of Regulations, title 17, sections 1215-1222.2 ("Title 17"), the regulations that govern the performance of breath alcohol analysis. Upon reviewing the machine's log, Hoxie opined Barrett's machine was a reliable machine that had been working properly. Barrett's calibration log showed his device had been tested 19 times between January 28, 1997, and February 26, 1998, with but one correction. The last test of his PAS device prior to its use on defendant occurred on November 17, 1997, more than 40 days prior to the device's use on defendant on December 28, 1997. The one test resulting in a correction was performed 11 months prior to the machine's use on defendant. At that test, the machine tested at .11, the highest reading allowed within the specifications. Despite the machine still testing within the allowable range, adjustments were made and the machine was retested. On the retest, the machine read .10.

DISCUSSION

I

Admitting PAS Test Results as Substantive Evidence of Intoxication
Defendant argues PAS test results are inadmissible as evidence under the language of section 23157, as that statute existed at the time of defendant's offense. We disagree.
Subdivisions (h) and (i) of former section 23157, now codified at section 23612 without change since defendant's incident, read as follows:
"(h) A preliminary alcohol screening test that indicates the presence or concentration of alcohol based on a breath sample in order to establish reasonable cause to believe the person was driving a vehicle in violation of Section 23140, 23152, or 23153 is a field sobriety test and may be used by an officer as a further investigative tool.
"(i) If the officer decides to use a preliminary alcohol screening test, the officer shall advise the person that he or she is requesting that person to take a preliminary *139 alcohol screening test to assist the officer in determining if that person is under the influence of alcohol or drugs, or a combination of alcohol and drugs. The person's obligation to submit to a blood, breath, or urine test, as required by this section [section 23612's implied consent requirement] for the purpose of determining the alcohol or drug content of that person's blood, is not satisfied by the person submitting to a preliminary alcohol screening test. The officer shall advise the person of that fact and of the person's right to refuse to take the preliminary alcohol screening test."
Defendant argues this language reflects a legislative intent for PAS tests to be used only as field sobriety tests, not as substantive evidence of intoxication. Defendant fails to acknowledge field sobriety tests may also serve as substantive evidence of intoxication. "As our Supreme Court has noted, what the Legislature has prohibited is driving a vehicle with a blood-alcohol rate over the proscribed limit, not driving when a chemical test shows it to be over the limit. (Burg v. Municipal Court (1983) 35 Cal.3d 257, 266, fn. 10 [198 Cal. Rptr. 145, 673 P.2d 732].) Thus, both parties are free to introduce circumstantial evidence bearing on whether the driver's BAL [blood-alcohol level] exceeded the permissible level. (Ibid.) `Evidence regarding the manner in which a defendant drove, performed field sobriety tests, and behaved is admissible and relevant as tending to establish that he did or did not have a 0.10 [now 0.08] BAL while driving.' (People v. Randolph (1989) 213 Cal.App.3d Supp. 1, 7 [262 Cal.Rptr. 378].)" (McKinney v. Department of Motor Vehicles (1992) 5 Cal.App.4th 519, 526, fn. 6, 7 Cal.Rptr.2d 18, emphasis added.)
Furthermore, contrary to defendant's argument, the statutory language reflects a legislative intent for PAS test results to be used for more than just field sobriety tests. The statute defines a PAS test used to establish reasonable cause to arrest someone as a field sobriety test, and then states such a field sobriety test "may be used by an officer as a further investigative tool." (§ 23612, subd. (h).) This language demonstrates PAS test results are not limited to informing the intuition of the investigating officer alone, but can be used for further, additional in-court purposes.
Defendant relies on Coniglio v. Department of Motor Vehicles (1995) 39 Cal. App.4th 666, 46 Cal.Rptr.2d 123, and Nick v. Department of Motor Vehicles (1993) 12 Cal.App.4th 1407, 16 Cal.Rptr.2d 305, to argue otherwise. Both cases are distinguishable. Coniglio was an appeal from the trial court's granting a writ of mandate compelling the Department of Motor Vehicles to reinstate a 20-year-old's driving privileges following her violation of section 23136, the zero tolerance law. The trial court determined the PAS test used to examine the driver did not satisfy the breath-alcohol analysis standards established in Title 17. (Coniglio v. DMV, supra, 39 Cal.App.4th 666, 46 Cal.Rptr.2d 123.)
The Sixth District Court of Appeal affirmed the trial court's judgment, but in doing so, ruled PAS devices were not subject to the standards set forth in Title 17. (Coniglio, supra, at p. 666, 46 Cal.Rptr.2d 123.) This ruling is contrary to the language of Title 17 as far as applicable here. The regulations require instruments used in California for breath alcohol analysis to meet standards promulgated by the National Highway Traffic Safety Administration ("NHTSA") of the U.S. Department of Transportation. Instruments meeting these standards are named in the Conforming Products List published by the NHTSA in the Federal Register. Only instruments named on the Conforming *140 Products List may be used for breath alcohol analysis in California. (Tit.17, §§ 1221.2, 1221.3.) Such instruments, when used for breath analysis, presumably are subject to Title 17.
The specific PAS device used in Coniglio was not identified in the record. Here, however, the record shows D'Arcy tested defendant's breath using an Alco Sensor IV. This instrument was originally listed on NHTSA's Conforming Products List in 1992, and continued to be listed at the time of defendant's incident. (57 Fed.Reg. 8376; 61 Fed.Reg. 3078.) Thus, the use of this device for breath analysis was subject to Title 17. Coniglio does not apply here.
Defendant relies upon dicta in Coniglio where the court uses the language of subdivisions (h) and (i) of former section 23157 to support its conclusion PAS devices were not subject to Title 17. Without analysis or supporting reasons, the court called the statute's reference to PAS devices as a "further investigative tool" as a limit upon their use. As explained above, we disagree with this interpretation of the statute.
Defendant's second citation to authority, Nick v. Department of Motor Vehicles, supra, 12 Cal.App.4th 1407, 16 Cal.Rptr.2d 305, also is distinguishable. There, the First District Court of Appeal affirmed the trial court's refusal to grant a writ of mandate compelling the Department of Motor Vehicles to restore a driver's license suspended from a driver arrested for violating section 23152. The driver contended the evidence did not support the Department's conclusion his blood-alcohol level was .08 percent or higher.
A "field breath testing unit" indicated the driver had a blood-alcohol level of .078 percent. Two chemical breath tests administered one-half hour after the arrest indicated he had a level of .08 and .09, respectively. Defendant argued the three tests, taken together, demonstrated his blood-alcohol level was rising. The appellate court stated the first test performed in the field was not admissible into evidence. "The field sobriety test, of course, is used not to establish blood-alcohol levels for purposes of ... section 13353.2, but to aid the police in determining if cause exists to arrest an individual. Furthermore, these tests are not performed on equipment licensed for the purpose of establishing blood-alcohol levels and, accordingly, there is no foundation for admitting the results. [Citation.]" (12 Cal.App.4th at p. 1417, 1418 & fn. 6, 16 Cal.Rptr.2d 305.)
Unlike the facts in Nick, the test performed on defendant was done so on equipment authorized by regulation for the purpose of establishing blood-alcohol levels. Thus, the prosecution may establish a foundation on which to admit the test results.
In People v. Bury (1996) 41 Cal.App.4th 1194, 49 Cal.Rptr.2d 107, the Second District Court of Appeal determined nothing in the language of subdivision (h) of former section 23157 exhibited an intent by the legislature to exclude PAS test results from evidence at trial. At the time Bury, Nick and Coniglio were decided, subdivision (h) authorized use of a PAS "only after the officer evaluates the totality of the circumstances, including the person's performance on the field sobriety tests and under both of the following conditions:
"(1) If a person refuses to take field sobriety tests or is incapable of taking the tests, the preliminary alcohol screening test may be used as a further investigative tool, unless the person refuses to take the preliminary alcohol screening test.
"(2) If the officer decides to use a preliminary alcohol screening test, the officer shall advise the person" of the officer's request to use the PAS to determine if the *141 person is under the influence, that taking the PAS does not relieve the person of his or her implied consent requirement, and the person may refuse to take the PAS. (Stats.1994, ch. 938, § 17, 5530.)
The Bury court determined subdivision (h) was enacted to enable evidence of intoxication to be found even when a suspect refuses to submit to the chemical test required under the implied consent law or refuses to take, or is incapable of taking, field sobriety tests. These purposes demonstrated the statute "was enacted to aid the prosecution of driving under the influence cases and not to exclude the admissibility of PAS evidence. PAS evidence may be relevant, not only to establish cause to arrest, but as tending to prove the essential element of the offense of drunk drivingthe accused's intoxication." (41 Cal. App.4th at pp. 1205-1206, 49 Cal.Rptr.2d 107.)
Since Bury was decided, the Legislature eliminated the requirement that PAS tests be used only where the intoxicant refuses or is unable to take other field sobriety tests and only after the officer evaluates the totality of the circumstances. (Stats. 1996, ch. 1154, § 70.) There are now no limitations on the officer's decision to administer a PAS test, other than periodic calibration pursuant to Title 17. These amendments display a continuing legislative intent to make PAS test results even more available to aid the prosecution of drunk driving cases than they were when Bury was decided. Where a statute has been construed by judicial decision, and that construction is not altered by subsequent legislation, it is presumed the Legislature is aware of the judicial construction and approves of it. (People v. Kelii (1999) 21 Cal.4th 452, 457-458, 87 Cal.Rptr.2d 674, 981 P.2d 518.)
Additionally, were we to accept defendant's argument under the circumstances and facts of this case, i.e., defendant's refusal to take a chemical exam, we would further thwart the legislative purpose behind former section 23157, subdivision (h). "Where, as here, the driver voluntarily takes a PAS test but later wrongfully refuses to take a chemical test under the implied consent law, he should not be able to profit therefrom by successfully challenging the admission of the PAS evidence. Otherwise, the legislative intent behind subdivision (h) would be subverted." (People v. Bury, supra, 41 Cal.App.4th at p. 1206, 49 Cal.Rptr.2d 107.)
Our state constitution requires "relevant evidence shall not be excluded in any criminal proceeding" unless the Legislature provides otherwise by a two-thirds vote of each house and subject to existing statutory rules of evidence governing, among other things, prejudice. (Cal. Const., art. I, § 28, subd. (d).) Defendant points to no statute adopted by any vote, let alone a two-thirds vote, which prohibits the admission of relevant PAS test results into evidence. Defendant's PAS test results were properly admitted unless, as defendant next argues, the results were admitted without proper foundation or their admission caused prejudicial harm. We turn next to these assertions.

II

Adequate Foundation for Admitting PAS Test Results
Defendant asserts the PAS test was administered to him in violation of Title 17. As a result, defendant claims no substantial evidence supports the trial court's determination the prosecution laid a sufficient foundation for admitting the PAS test results into evidence. We agree the number and magnitude of regulatory violations rendered the foundation insufficient, *142 but determine admitting the evidence was harmless error.
"An `official duty' is imposed upon law enforcement agencies and their officers and employees under section 436.52 of the Health and Safety Code and regulations promulgated thereunder to perform blood alcohol analyses by methods devised to assure reliability. Section 436.52 provides: `The testing of breath samples by or for law enforcement agencies for purposes of determining the concentration of ethyl alcohol in the blood of persons involved in traffic accidents or in traffic violations shall be performed in accordance with regulations adopted by the State Department of Health Services. [¶] The rules and regulations shall establish the procedures to be used by law enforcement agencies in administering breath tests for the purposes of determining the concentrations of ethyl alcohol in a person's blood....' The 'shall' wording of the statutes makes clear that the procedures established by the rules are to be mandatory and that compliance constitutes a duty imposed upon the agencies and individual officers and civilian employees who administer, analyze, and report the tests.
"Pursuant to Health and Safety Code section 436.52, supra, the Department of Health Services has promulgated [Title 17]. The rules set detailed standards for the licensing and operation of forensic alcohol laboratories, the training of personnel, the collection and analysis of samples in general, and the manner of expressing results. ([Tit. 17,] §§ 1215-1220.4.) Article 7 of the rules ( [id.] §§ 1221-1221.5) comprises the requirements for breath alcohol analysis, including standards for procedures ([id.] §§ 1221.1, 1221.4), standards for instrument performance ([id.] § 1221.2), and approved instruments ([id.] § 1221.3). [¶] The foregoing regulations establish a standard for the competency of the results of blood-alcohol tests. (People v. Adams [1976] 59 Cal.App.3d [559,] 567 [131 Cal.Rptr. 190].) Compliance with the regulations establishes both a foundation for admission of test results into evidence in any proceeding and a basis for finding such results to be legally sufficient evidence to support the requisite findings in such proceeding. (Ibid.)" (Davenport v. Department of Motor Vehicles (1992) 6 Cal.App.4th 133, 141-142, 7 Cal.Rptr.2d 818, fn. omitted.)
The trial court acknowledged defendant's PAS test was not administered in compliance with the Title 17 regulations in numerous respects, but determined the prosecution had nonetheless established a sufficient foundation to admit the evidence: "[The prosecution] made no showing of any compliance with Title 17, and I'm convinced that there will bethere is a reason to believe that there is a lot of noncompliance with Title 17. [¶] And that I'm not even sure there was substantial compliance with Title 17. There was a partialthere was some compliance....
"....................
"[However, we] have got a qualified, competent, operator, utilizing a machine that's certified by the Highway Patrol to test for breath concentrations of alcohol. It's been calibrated on innumerable occasions. He's used it and achieved results on many occasions. It's virtuallyit's virtually impossible, based upon his testimony, to use it and get a result if you are using the machine improperly. [¶] And so for those reasons, on balance, I think the jurythe evidence is more probative than it is prejudicial, certainly. Highly probative. And that ultimately the jury will decide whether or not it has any weight." (Emphasis added.)
The trial court admitted the evidence, subject to instructing the jury on the application and requirements of Title 17. The *143 court further instructed the jury the police officers' failure to comply with Title 17 "may be considered by you in determining the accuracy and reliability, if any, of the test results in this case."
In admitting the evidence, the trial court apparently followed the reasoning of People v. Adams, supra, 59 Cal.App.3d 559, 131 Cal.Rptr. 190, and People v. French (1978) 77 Cal.App.3d 511, 143 Cal.Rptr. 782, where the courts admitted breath analysis test results into evidence despite technical violations of Title 17. The Adams case concerned whether the failure of the breath test to strictly comply with Title 17's calibration procedure rendered the test results inadmissible. At that time, the regulation required the usual operator of the instrument to test the device using "unknown samples" either weekly or following every 100 tests of subjects, whichever came sooner, and to report those results to a licensed forensic alcohol laboratory. (People v. Adams, supra, at p. 563, 131 Cal.Rptr. 190.) An expert witness testified he had not complied with the regulation, but had tested the device by running standard known samples through it prior to each actual use on subjects. In the expert's opinion, this served essentially the same function as the testing of unknown samples required by the regulation. (Id. at p. 567, 131 Cal. Rptr. 190.)
The appellate court agreed, calling the violation a "technical violation." (People v. Adams, supra, at p. 567, 131 Cal.Rptr. 190.) The court noted the defendants did not contend an inadequate foundation was presented as to the reliability of the machine due to the violation, nor did they attempt to show noncompliance affected the test results in any way. (Ibid.) Under these circumstances, the appellate court reasoned: "[Noncompliance [with Title 17] goes merely to the weight of the evidence. The regulations are an expressed standard for competency of the test results; in effect, they are a simplified method of admitting the results into evidence. Were the rule to provide that the evidence of the test results would be inadmissible if the regulation were not followed there would be the incentive to turn the drunk driving case into a contest to find a technical defect in the test procedure so as to have the evidence excluded. Under the present rule, if the test procedure does not comply with the regulations, a defendant is protected, as the prosecution then must qualify the personnel involved in the test, the accuracy of the equipment used and the reliability of the method followed before the results can be admitted." (Id. at p. 567, 131 Cal.Rptr. 190.)
We, like the Adams court, have no desire to establish incentives for converting drunk driving cases into contests for finding a single technical defect in order to exclude otherwise relevant evidence. However, where the defects are not merely singular or technical, but are instead systemic, numerous, and demonstrate a failure to comply at least substantially with Title 17, our concern focuses less on creating evidentiary contests and more on a government agency's intentional failure to comply with mandatory duty. The facts of this case cross that line.
Unlike in Adams, where the test was subject to only a single technical defect and the defendants did not challenge the adequacy of the foundation laid, defendant's test here was so riddled with violations he does challenge the adequacy of the foundation laid. We review briefly the regulatory violations as they relate to the foundational points Adams requires be established if the regulations are not followed.

*144 A. Evidence of Machine's Working Order

Title 17 requires the machine to be checked for accuracy in the manner described above (testing .10 solution for a reading between .09 and .11) either every 10 days or following the testing of every 150 subjects, whichever occurs earlier. (Tit.17, § 1221.4, subd. (a)(2)(B).) This check is to be performed either by certain persons employed by a forensic alcohol laboratory or by persons who have successfully completed training in using the instrument being tested and who are called upon to use a breath testing instrument in the performance of their duties. (Id. subds. (a)(2)(A), (a)(5).) Such training must include instruction in the theory of the device's operation, detailed procedure of operation, practical experience, use of a precautionary checklist, and a written and/or practical examination. (Id. subds. (a)(3)(A), (B), (C), (D), (E).) The results of the check are to be used by a forensic alcohol laboratory to determine if the instrument operates as required by Title 17. (Id. subd. (a)(2)(A).)
The test log for the Alco Sensor IV used on defendant records the device was tested for accuracy 19 times between January 28, 1997, and February 26, 1998. Of those tests, 7 tests were performed within the 10-day regulatory time period and 11 were not. Of those 11 tests, 5 were performed after more than 30 days. One test had to be repeated because the operator used expired solution.
None of the tests were performed by employees of an alcohol forensic laboratory. All but two of the tests were performed by an Officer Pangburn of the California Highway Patrol who had retired by the time of trial. Officer Stephen Hoxie replaced Pangburn. Hoxie testified he and Pangburn received the same training and followed the same procedures in testing the instrument. Hoxie testified his training consisted of attending an eight-hour course and working with Pangburn for two months. There was no evidence in the record this training satisfied all of the requirements of Title 17. There was also no evidence in the record Pangburn or Hoxie forwarded the results of their tests to a forensic alcohol laboratory for determination of the device's compliance with Title 17's accuracy standards.

B. Evidence the Test Was Administered Properly to Defendant

Title 17 requires a breath sample be collected only after the subject has been under continuous observation for at least 15 minutes prior to the test, during which time the subject must not have ingested alcoholic beverages or other fluids, regurgitated, vomited, eaten or smoked. (Tit.17, § 1219.3.) The test on the subject must include two separate breath samples which result in determinations of blood alcohol concentrations which do not differ from each other by more than 0.02 grams per 100 milliliters. (Tit.17, § 1221.4, subd. (a)(1).) All results are to be expressed in terms of alcohol concentration in blood. (Tit.17, § 1220.4, subd. (a).)
Officer D'Arcy had used this particular device over 100 times, and it appeared to him to function properly when he used it on defendant. D'Arcy administered the test on defendant in the manner he had been trained. Defendant did not burp, vomit, spit up, eat or drink anything while he was under observation prior to taking the test.
However, Officer Scocca first contacted defendant at approximately 2:02 a.m. D'Arcy arrived at the scene at approximately 2:05 a.m. and, after administering the PAS test, arrested defendant at approximately 2:15 a.m. D'Arcy thus likely performed the PAS test less than 15 minutes after the officers began continuous *145 observation of defendant. D'Arcy also performed only one test instead of the required two.
Most significantly, there is no evidence in the record the result published by the device was expressed in terms of alcohol concentration in the blood. The officers testified they believed the number provided by the device was a measurement of blood alcohol level, but that testimony was insufficient to establish whether the breath device in fact measured alcohol content in blood. "Absent a controlling statute, the test results must be interpreted at the trial by an expert witness under the general requirements for expert testimony." (People v. Adams, supra, 59 Cal.App.3d at p. 561, 131 Cal.Rptr. 190, emphasis added, citations omitted.) The testifying officers were not qualified to interpret the results as a measurement of alcohol content in defendant's blood.

C. Evidence D'Arcy was Competent and Qualified

Title 17 authorizes a law enforcement officer who must operate a breath analysis device as part of his or her duties to do so upon successful completion of the training described above. (Tit.17, § 1221.4, subd. (a)(5).) This training must be under the supervision of persons who qualify as forensic alcohol supervisors, forensic alcohol analysts or forensic alcohol analyst trainees in a licensed forensic alcohol laboratory. (Id. subd. (a)(4); see § 1215.1.)
Officer D'Arcy received his training from a Highway Patrol sergeant who was not a licensed forensic alcohol supervisor. There also was no evidence in the record the sergeant qualified as an alcohol analyst or analyst trainee.
D'Arcy testified his training consisted of instruction in the operation of the device. It did not include instruction on the theory of the device's operation nor did it include an examination. D'Arcy maintained he did not follow the checklist of instructions printed on the machine, which should have been part of his training (Tit.17, § 1221.4, subd. (a)(3)), but instead followed the manner in which he was trained.
It is apparent from the above the California Highway Patrol has designed and implemented training and maintenance programs and procedures for the Alco Sensor IV which do not satisfy the requirements of Title 17. Not surprisingly, officers in the field are also using the device in a manner which does not satisfy the requirements of Title 17. Yet the California Highway Patrol is under a mandatory duty to comply with Title 17. While Adams may authorize the admission of test results where substantial compliance with Title 17 is shown, it does not authorize the negation of a mandatory duty where, as here, substantial compliance is not shown. To hold otherwise would render Title 17 a nullity, and excuse a law enforcement agency from complying with the law.
Beginning in the 1960's, courts began a fruitless, short-lived search for perfection in the law. (See former Court of Appeal Justice Macklin Fleming's classic work, The Price of Perfect Justice, The Adverse Consequences of Current Legal Doctrine on the American Courtroom (1974).) In fairly short order, courts began to see that peace officers and their agencies are, like everyone else, imperfect. Before long, courts began to return to a more practical and balanced mode. (See, e.g., Illinois v. Gates (1983) 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 [whether probable cause to arrest exists is a practical, commonsense issue based on totality of the circumstances, not on application of rigid rules]; but see Judge Harold Rothwax, Guilty: The Collapse of Criminal Justice (1997).) In the aftermath of this still-continuing *146 judicial return to reason, peace officers and their agencies would be mistaken to assume they may seek haven in the good faith exception to the exclusionary rule, for example, and there find a license to be casual or, worse, careless.
The exclusionary rule is a judicially created remedy designed to deter just such conduct. "As with any remedial device, the rule's application has been restricted to those instances where its remedial objectives are thought most efficaciously served. [Citations.] Where `the exclusionary rule does not result in appreciable deterrence, then, clearly, its use ... is unwarranted.' [Citation.]" (Arizona v. Evans (1995) 514 U.S. 1, 10-11, 115 S.Ct. 1185, 1191, 131 L.Ed.2d 34, 44.)
Exclusion of PAS test results in every drunk driving case involving an Alco Sensor IV will deter intentional reliance upon a flawed system that, despite the best intentions and sincere efforts of the vast majority of members of the Highway Patrol, will continue to deliver untrustworthy test results in every drunk driving case until it is appropriately corrected. "[T]he validity of the test itself is to be determined in accordance with general scientific standards ...." (People v. Adams, supra, 59 Cal.App.3d at p. 567, 131 Cal.Rptr. 190 emphasis added.) Those scientific standards are embodied in Title 17, and the Highway Patrol will be able to produce such scientifically valid evidence once it brings its training and maintenance program into compliance with Title 17.
Adams and its progeny were crafted to address anomalies or occasional errors and innocent lapses in law enforcement. They were not meant to provide a means for peace officers and their agencies to ignore clear, easy-to-apply statutory law and administrative rules, for any reason, including budget or personnel constraints.
Evidence of a PAS breath analysis is thus inadmissible unless sufficient foundational evidence demonstrates the test was performed in substantial compliance with Title 17. Because the Highway Patrol did not substantially comply with Title 17 here, the trial court erred by admitting into evidence the results of defendant's PAS test.
Although we have found error, we must still decide whether the error resulted in a miscarriage of justice. We determine whether the improper admission of evidence requires reversal pursuant to the harmless error standard established by People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243. (People v. Alvarez (1996) 14 Cal.4th 155, 216, 58 Cal.Rptr.2d 385, 926 P.2d 365.) Under this standard, we must reverse the judgment if we conclude it is reasonably probable there would have been a different outcome had the error not occurred.
We conclude, in this instance, the error was harmless. Even if the PAS test results has not been admitted, overwhelming evidence remained upon which a jury could convict defendant of driving under the influence of alcohol.
The officers observed defendant had a strong odor of alcohol emitting from his breath. They also observed him to have bloodshot, watering eyes and slurred speech detectable despite defendant's speech impediment.
Defendant failed the two field sobriety tests given him prior to the PAS test. The first test required him to recite the alphabet from A through Z in a loud and clear voice. Defendant recited the alphabet to the letter T, then stopped for approximately six to eight seconds, then continued to the letter Z. It appeared to the observing officer defendant stopped at the letter T *147 because he had forgotten where he was in the alphabet.
The second test required defendant to touch each of the fingers on his left hand with his left thumb while counting one through four, then to repeat the exercise in reverse order while counting back from four to one. Defendant held out his hand, counted from one to four, then from four to one, but did so without touching any of his fingers as he had been instructed. He merely kept his open palm out.
Most significantly, defendant refused to take a chemical exam in violation of the implied consent law. This refusal was admissible to prove defendant's consciousness of guilt, and the jury was so instructed. (People v. Sudduth (1966) 65 Cal.2d 543, 547, 55 Cal.Rptr. 393, 421 P.2d 401; CALJIC No. 16.835.)
As a result of this evidence, we conclude it is not reasonably probable the jury would not have convicted defendant had the PAS test results not been admitted. Accordingly, the judgment is not reversed due to the improper admission of the PAS test results.

III

Prejudicial Effect of Admitting PAS Test Results
Defendant claims the trial court abused its discretion when it denied defendant's motion under Evidence Code section 352 to exclude the PAS test results from evidence. Because we have already determined the evidence should not have been admitted, we need not address defendant's argument on this point.
We note, however, a trial court's erroneous admission of prejudicial evidence is reviewed for harmless error. (People v. Alvarez, supra, 14 Cal.4th at p. 216, 58 Cal.Rptr.2d 385, 926 P.2d 365.) As discussed above, the admission of the PAS test results was harmless. Sufficient evidence existed on which the jury could convict defendant had the test results not been admitted. It is thus not reasonably probable the jury would have reached a different verdict had the error not occurred.

DISPOSITION
The judgment is affirmed.
HULL, J, concurs.
CALLAHAN, J, concurs in the result.
NOTES
[1] All references to sections are to sections of the Vehicle Code unless noted otherwise.