Filed 6/1/26  P. v. Leon CA3

<u>NOT TO BE PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Lassen)

| | |
|---|---|
| THE PEOPLE,<br>        Plaintiff and Respondent,<br><br>        v.<br><br>DOUGLAS AMIBAL LEON,<br>        Defendant and Appellant. | C102472<br><br>(Super. Ct. No. 2023-CR0089854) |

Defendant Douglas Amibal Leon (defendant) and codefendant Roger Alberto Vasquez (Vasquez) were inmates on a prison yard when they attacked and stabbed another inmate to death.  At the trial of both defendants, a jury found defendant guilty of first degree murder and custodial possession of a weapon, and found true the special circumstance allegation that the murder was committed by means of lying in wait.  On appeal, defendant contends the trial court erred by denying his motion for sanctions predicated on the failure to preserve surveillance video of the hours leading up to the stabbings.  We disagree and affirm the judgment.

**FACTS AND PROCEEDINGS**

On November 27, 2019, just before 3:00 p.m., Correctional Officer Randall Roberts was working as a yard officer at High Desert State Prison in Lassen County.  From about 50 yards away, Roberts saw two inmates, later identified as defendant and

1

codefendant Vasquez, striking another inmate, later identified as Edgardo Herrera. Another officer ordered the inmates in the yard to get down. All the inmates in the yard assumed seated or prone positions except for defendant and Vasquez, who continued to strike Herrera. Roberts and his partner moved quickly toward the incident and called for more officers to respond. As Roberts approached the fighting inmates, he saw defendant and Vasquez each holding a piece of dark flat metal in their right hands as they struck Herrera, who did not appear to be armed.

When he was about 15 feet away from the altercation, Roberts threw an oleoresin capsicum (O.C.) grenade.[1] The O.C. grenade "burst" but did not stop defendant and Vasquez from continuing to attack Herrera. Another officer threw a second O.C. grenade, and officers sprayed defendant and Vasquez in the face with O.C. spray. Defendant and Vasquez eventually stopped attacking and separated from Herrera, and defendant tossed his weapon as he was getting into the prone position. Defendant and Vasquez were handcuffed, and medical personnel arrived to administer aid to Herrera. Officers located the weapons used in the attack, nearly identical pieces of metal that were seven-inches long and one-inch wide. Officer Roberts later testified that he did not observe defendant and Vasquez interacting in the yard before the incident.

A surveillance video from the prison yard beginning about 18 seconds before the attack showed defendant and Vasquez standing approximately 15 yards from Herrera, near a concrete block that contained outdoor urinals and a water fountain. Vasquez appeared to use the urinal while defendant stood on the other side of the concrete block, drinking from the water fountain. Herrera and another inmate were alternating sets of pushups. Defendant and Vasquez glanced at Herrera several times. As the other inmate finished his set of pushups, indicating that Herrera was about to begin his set, defendant

---

[1] Oleoresin capsicum is a nonlethal chemical agent similar to pepper spray.

walked to the other side of the concrete block and appeared to grab an object from underneath the water fountain.

When Herrera moved into a prone position to perform his set of pushups, defendant and Vasquez immediately rushed toward Herrera. Herrera continued performing pushups and did not appear to notice defendant and Vasquez approaching him. Herrera stood up after completing three pushups. As Herrera began to turn his head toward them, defendant and Vasquez attacked him, stabbing him repeatedly. Approximately 30 seconds later, an O.C. grenade detonated on Herrera's chest, and defendant and Vasquez continued stabbing Herrera. Two seconds after that, multiple officers appeared on screen and began spraying O.C. at defendant and Vasquez, and a second O.C. grenade detonated near the men. Approximately 10 seconds later, defendant and Vasquez separated from Herrera. The surveillance video shows copious amounts of blood on or near Herrera, who died at the hospital.

Correctional Officer Benjamin Parrish reviewed the videos of the yard from multiple cameras and preserved the footage starting 18 seconds before the incident. He testified that the surveillance system automatically deletes video after 90 days if not preserved. In determining what video to preserve, he looked for footage that might be relevant to the incident, including "where the weapons came from, if someone else maybe handed them off, if somebody else was involved." He saw at least one weapon was acquired at the urinal area, but he saw nothing of note, such as the attackers making an effort to conceal themselves or watching the victim, on the video prior to the 18 seconds immediately before the attack. He agreed that he could have preserved the video for an hour or two before the incident but did not.

Before trial, defendant moved to dismiss the lying-in-wait special circumstance allegation on the basis that his right to due process was violated by prison staff's bad-faith loss or destruction of surveillance video showing defendant's and Vasquez's movements throughout the day of the incident, beyond the 18-second video of the prison

3

yard immediately before the attack. Vasquez joined defendant's motion and also moved to dismiss the lying-in-wait allegation based on insufficient evidence. In response, the People argued that defendant had failed to establish that the destroyed surveillance video was either material or exculpatory or that its destruction was a result of bad faith.

At a hearing on the motion, defendant acknowledged that he was unable to make an offer of proof as to what was on the lost surveillance footage because he had not been able to review it. However, defendant observed that the prosecution had previously suggested that it would argue lying in wait had occurred during a time before that captured by the retained surveillance video, and argued he could not refute that argument without the benefit of the destroyed surveillance video. He added the destroyed surveillance video could be hypothetically exculpatory as to the lying-in-wait special circumstance if the video showed that defendant and Vasquez had not been in contact in the hours before the attack. Vasquez added, "a video that shows everything that happened before the 18 seconds [of the surveillance video that was retained] could be exculpatory and we just don't know."

The prosecutor argued the defense bore the burden to make a prima facie showing that the lost surveillance video was both material and exculpatory, but neither defense attorney had made an offer of proof as to the materiality or exculpatory nature of the lost video. The trial court denied the motion, stating, among other things, that while the prison had a record preservation protocol, the court had not seen any evidence of bad faith or anything that would indicate the lost video footage was material and exculpatory.

A jury found defendant and Vasquez guilty of first degree murder (Pen. Code, § 187, subd. (a); count I)[2] and custodial possession of a weapon (§ 4502, subd. (a); count II). As to count I, the jury found true the special circumstance allegation that the murder

---

[2] Undesignated statutory references are to the Penal Code.

4

was committed by means of lying in wait.  (§ 190.2, subd. (a)(15).)  In a bifurcated court trial, the court found true that defendant had previously been convicted of a serious felony within the meaning of section 667, subdivisions (b) through (i), and section 1170.12.

The trial court sentenced defendant on count I to life in prison without the possibility of parole.  The court sentenced defendant on count II to a concurrent middle term of three years, doubled because of the prior strike conviction, for a total of six years.

Defendant timely filed a notice of appeal.  Codefendant Vasquez also appealed, and another panel denied his appeal on April 1, 2026.  (*People v. Vasquez* (Apr. 1, 2026, C102449 [nonpub. opn.].)

## DISCUSSION

Defendant contends the trial court erred when it denied his pretrial motion to dismiss the lying-in-wait special circumstance allegation, which he argued was warranted due to prison staff's bad-faith failure to preserve surveillance video of his and Vasquez's movements throughout the prison on the day of the murder.  Defendant has failed to establish error.[3]

" ' "Due process does not impose upon law enforcement 'an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.' " [Citation.]  At most, the state's obligation to preserve evidence extends to "evidence that might be expected to play a significant role in the suspect's defense." ' " (*People v. Fultz* (2021) 69 Cal.App.5th 395, 424.)  Law enforcement agencies have a duty to preserve evidence that is constitutionally

---

[3]  The People argue in passing that defendant forfeited this challenge by failing to specifically request dismissal of the lying-in-wait special circumstance, although they recognize that defendant requested sanctions and exclusion of evidence because of the lost footage.  Because defendant moved in limine for sanctions based on the lost footage, we address defendant's claim on the merits.

material; that is, it "possess[es] an exculpatory value that was apparent before the evidence was destroyed" and is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*California v. Trombetta* (1984) 467 U.S. 479, 489; *Fultz*, at p. 424.)

Instead of proving the exculpatory value of lost evidence, a defendant may show that "potentially useful" evidence was destroyed in bad faith. (*Arizona v. Youngblood* (1988) 488 U.S. 51, 58.) "Potentially useful" evidence is "material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." (*Id*. at p. 57.) In reviewing defendant's *Trombetta*/*Youngblood* motion, we "must determine whether, viewing the evidence in the light most favorable to the superior court's finding, there was substantial evidence to support its ruling." (*People v. Roybal* (1998) 19 Cal.4th 481, 510.) The burden is on the defendant to show bad faith by law enforcement. (*People v. DePriest* (2007) 42 Cal.4th 1, 42.)

Defendant argues that the lost surveillance footage was potentially useful to the defense because it would have undermined the prosecution's theory that the defendants engaged in planning and coordinating the attack ahead of time and supported defendant's argument that the mere seconds of waiting and watching shown by the video footage was insubstantial. Defendant further argues that the lost footage showed bad faith because of prison policy requiring the preservation of video and the investigating officer knew or should have known the absence of any evidence the defendant and Vasquez placed weapons in the yard or communicated or coordinated with anyone was potentially exculpatory, at least as to punishment.

Defendant did not directly make a *Trombetta* argument in his brief, relying primarily on *Youngblood*, but he does argue that the surveillance footage would have strongly undermined the government's theory that he was lying in wait, which implies that he believes this evidence was material and not merely "potentially useful." We

conclude substantial evidence supports the trial court's determination that the lost footage was not material.

The jury heard testimony from Officer Roberts that he did not observe defendant or Vasquez interacting in the yard before the incident, and Officer Parrish testified that he did not see defendant or Vasquez trying to conceal themselves or watching the victim in any of the other video footage he reviewed. Defendant had the opportunity to cross-examine these witnesses about the lack of any direct evidence showing his and Vasquez's preparation for the attack. The video footage would only confirm the testimony already given that defendant and Vasquez were not seen doing anything related to the attack more than 18 seconds prior. The mere possibility that the surveillance video might have been exculpatory does not satisfy the standard of constitutional materiality (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 773), and there is no evidence that the video had apparent exculpatory value before it was lost. Accordingly, the trial court did not err in denying defendant's implied motion under *Trombetta*. (See *California v. Trombetta*, *supra*, 467 U.S. at p. 489; *People v. Fultz*, *supra*, 69 Cal.App.5th 395 at p. 424.)

We also reject defendant's claim under *Youngblood*. Even assuming the lost footage was potentially useful, defendant has not shown that the loss was a result of bad faith. While destruction of evidence could give rise to an inference of bad faith, this is but one inference. Another inference was that the investigating officer did not think anything in the lost video was relevant, as he testified to the jury. That was the inference the trial court believed to be more reasonable, and we conclude substantial evidence supports that inference. To the extent defendant argues that failure to preserve the video violates prison policy, such a violation goes to the weight of the evidence, as found by the trial court. (See *People v. French* (1978) 77 Cal.App.3d 511, 522.) As a result, defendant cannot rely on *Youngblood* and the government's purported ill intent to demonstrate a due process violation.

**DISPOSITION**

The judgment is affirmed.

/s/
WISEMAN, J.*

We concur:

/s/
ROBIE, Acting P. J.

/s/
FEINBERG, J.

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.